UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY MILLMAN and JENNIFER MILLMAN<br><br>                Plaintiffs,<br><br>         v.<br><br>ETHOS RISK SERVICES, LLC, THE LINCOLN NATIONAL LIFE INSURANCE COMPANY d/b/a LINCOLN FINANCIAL GROUP, EMPERION MCN f/k/a GENEX SERVICES and JAMES A. CHARLES,<br><br>                Defendants. | Case No. 24-cv-4370 (KMK)(VR)<br><br>**STIPULATION** |

        **IT IS HEREBY STIPULATED AND AGREED** by the undersigned counsel that pursuant to Fed.R.Civ.P. 15(a)(2), Plaintiffs may file the attached third amended complaint; and

        **IT IS FURTHER STIPULATED AND AGREED** that an electronic signature shall be considered an original for all purposes; and

        **IT IS FURTHER STIPULATED AND AGREED** that any party may file this stipulation upon it being fully executed by counsel for all parties.

Dated:  September 12, 2025


| | |
|---|---|
| **SHEPPE LLP** | **HOPKINS PA** |
| /s/Matthew Sheppe | /s/Chrisopher B. Hopkins |
| By:  Matthew Sheppe | By:  Christopher B. Hopkins |
| 425 Madison Avenue, 19th Floor<br>New York, New York 10017 | 516 S. Dixie Hway, Suite 227<br>West Palm Beach, Florida 33401 |
| *Attorneys for Plaintiffs* | *Attorneys for Emperion, Inc.* |

**YANKWITT LLP**

/s/Jonathan Ohring

By:  Russell M. Yankwitt
        Jonathan Ohring

140 Grand Street, Suite 705
White Plains, New York 10601

*Attorneys for Ethos Risk Services,*
*LLC*

**RIVKIN RADLER LLP**

/s/Eric Strober

By:  Eric Strober
        Lauren E. Russo

926 RXR Plaza
Uniondale, New York 11556-0926

*Attorneys for James A. Charles*

**MAYNARD NEXSEN**

/s/Ann-Martha Andrews

By:  Ann-Martha Andrews

2025 N. 3rd Street, Ste. B300
Phoenix, Arizona 85004

*Attorneys for The Lincoln National*
*Life Insurance Company*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY MILLMAN and JENNIFER MILLMAN<br><br>                    Plaintiffs,<br><br>          v.<br><br>ETHOS RISK SERVICES, LLC, THE LINCOLN NATIONAL LIFE INSURANCE COMPANY d/b/a LINCOLN FINANCIAL GROUP, EMPERION MCN f/k/a GENEX SERVICES and JAMES A. CHARLES,<br><br>                    Defendants. | Case No. 24-cv-4370 (KMK)(VR)<br><br>**THIRD AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs' Jeffrey Millman ("Mr. Millman") and Jennifer Millman ("Mrs. Millman" and together with Mr. Millman, "Plaintiffs"), by their attorneys, Sheppe LLP, as and for their third amended complaint against Defendants Ethos Risk Services, LLC ("Ethos"), The Lincoln National Life Insurance Company d/b/a Lincoln Financial Group ("Lincoln"), Emperion MCN f/k/a Genex Services ("ECN") and James A. Charles ("Dr. Charles"), and together with Ethos, ECN and Lincoln, "Defendants") allege the following upon personal knowledge as to their own acts and status and upon information and belief as to the acts and status of all others:

## INTRODUCTION

1.  Mr. Millman suffered from a cerebrospinal fluid leak ("CSF Leak") and suffers from resulting intracranial hypertension and chronic headaches, which have frequently left and continue to leave Mr. Millman unable to sit upright or walk, in excruciating pain, and with blurred vision, head pain and nausea.

2.  Defendants, in a coordinated effort that went way beyond the bounds of human decency, fabricated "facts" that allowed Lincoln to deny Mr. Millman his disability benefits, which he had been receiving since October 2019.

3.  A summary of the case is as follows:

- From on or about October 2019 to on or about July 2023, Mr. Millman received disability benefits from BNY Mellon's short-term disability program (for the first six months) and then Lincoln. During this time, nobody at Lincoln disputed his need to be on disability.

- In March 2023, Casey Miranda, a Group Protection specialist (the department that typically denies claims), replaced Chenta Kennedy, a Technical Claims specialist (the group that administers claims), as Mr. Millman's case manager.

- Immediately after Ms. Miranda became Mr. Millman's case manager, private investigators were assigned to follow Mr. Millman on at least two separate occasions. Surveillance was conducted at a little league baseball game and during Mr. Millman's visit to an Independent Medical Examiner (IME). Video was taken of both days.

- Video of the baseball game was heavily edited to support the claim that Mr. Millman was not disabled. However, there remained a portion of video from 43:49 to 45:00 that shows Mr. Millman in so much pain that he needed support as he walked to his car (picture below). One of these people drove him home because Mr. Millman was blinded by pain.



- Nonetheless, the private investigator's report concluded that "during this investigation, the claimant's movements appeared both fluid and unrestricted in nature at all times and no outward signs of impairment were observed." After claiming that he viewed the video and read the corresponding report, and after receiving considerable pressure from Lincoln, the IME doctor concluded that Mr. Millman "at the end of this sunny active day, he is smiling with no loss of energy."

- Based on the investigators' and IME's reports, Mr. Millman was denied continuing disability coverage.

- Mr. Millman went through a lengthy, expensive and arduous appeal process. At the end of this process, the decision was reversed. The doctor who reviewed the appeal wrote:

  "The surveillance is consistent with observing the claimant exit the playing field before the activity was completed and documents his need for physical assistance to ambulate across a baseball field. The information is consistent with an individual who has had a good but incomplete response to treatment and who was attempting to be involved in regularly scheduled community activities with his children however he was not able to complete this activity. Therefore, it is my opinion that the surveillance reinforced the conclusion that the claimant continues to require medically necessary restrictions and limitations as his pain related symptoms are of the severity and frequency that they do not allow him to perform vocational or prevocational activities on a regular and predictable basis."

- The denial of benefits and resulting appeal caused Mr. and Mrs. Millman to lose in excess of $500,000

- Despite disability benefits being reinstated, Lincoln had multiple different investigators surveil Mr. Millman afterwards.

- Mr. Millman's computer was also hacked.

- In addition to his monetary losses, Mr. Millman has been traumatized, and his medical and psychological health have worsened significantly, leading him to be admitted to the Mayo Clinic, where his admission had previously been denied.

- The doctors at the Mayo Clinic made significant changes to Mr. Millman's medical regimen but he still suffers from head pain, nausea, and vision issues.

- Mr. Millman is afraid to go outside and limits his activity as much as possible as he is scared that someone is following him.

- Mr. Millman's family has been impacted by his increased pain and fear of going outside. His sons often look behind them when they are leaving their home in the car to make sure that no one is following them.

- This case is not about ERISA but rather about how four supposedly independent companies/individuals conspired to create a lie about Mr. Millman, causing the damages set forth above and below.

4. Indeed, Mr. Millman's disability was so obvious, that the Defendants had to both completely ignore empirical facts **and** contrive evidence to support the fiction that he was not disabled.

5. Defendants' actions directly i) caused a significant deterioration in Mr. Millman's health, leading to his reapplication and acceptance to the Mayo Clinic after he was denied the first time; ii) caused Mr. Millman to change his garage codes due to his legitimate fear that someone would illegally enter his house; and iii) left Mr. Millman terrified just to leave his house (even though his doctors have advised him to walk for health purposes) for fear that it would result in yet another denial of his disability benefits, leaving him unable to support himself, his wife and two young children, and exacerbating his already extremely painful and debilitating illness.

6. Indeed, the underhanded and callous manner in which Defendants worked to deny Mr. Millman his disability benefits was not only atrocious and exactly the kind that any civilized community would find to be utterly intolerable, but it has scarred Mr. Millman both physically and emotionally. Such outrageous conduct should not be allowed to go unpunished.

## FACTUAL BACKGROUND

## PARTIES

7. Plaintiff Jeffrey Millman is an individual who at all relevant times hereto resided in Mamaroneck, New York.

8.  Plaintiff Jennifer Millman is an individual who is married to Jeffrey Millman and at all relevant times hereto resided in Mamaroneck, New York.

9.  Defendant Ethos Risk Services LLC is a Delaware limited liability company whose principal place of business is St. Petersburg, Florida.

10. Ethos is a licensed private investigator in New York State, with the license number 11000158973.  Ethos' website states that it conducts business in all 50 states.

11. Defendant Lincoln is an Indiana corporation whose principal place of business is Indiana.

12. Defendant Dr. Charles is an individual who is a citizen of New Jersey.

13. Defendant ECN, formerly known as Genex Services, is a Pennsylvania corporation with a principal place of business at 440 Swedesford Road, Suite 1010, Wayne, PA 19087.

## JURISDICTION AND VENUE

14. This court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §1332 in that there is complete diversity among the parties because Plaintiffs are citizens of the State of New York and Defendants are citizens of the States of Florida, Delaware, New Jersey and Pennsylvania, and because Plaintiffs assert claims for damages in excess of seventy-five thousand dollars ($75,000.00).

15. This court has personal jurisdiction over the Defendants pursuant to CPLR § 302(a)(1), (a)(2) and (a)(3) in that Defendants transact business within the state of New York, Defendants committed tortious acts against Plaintiffs within the state of New York, and Defendants committed tortious acts outside of New York causing injury within New York, and Defendants both regularly do business within New York, and reasonably should have expected their acts to have consequences in New York and derives substantial revenue from interstate commerce, and pursuant to Fed.R.Civ.P. 4(k) in that Dr. Charles resides within 100 miles of the courthouse and is being joined in this action pursuant to Fed.R.Civ.P. 14.

5

16. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §1391(b)(1) in that Plaintiffs reside in the Southern District of New York.

## FACTUAL ALLEGATIONS

### CSF Leak and Related Symptoms and Treatments

17. On or about October 2019, Mr. Millman was diagnosed with a CSF leak, leaving him unable to continue working.

18. Mr. Millman's symptoms from his CSF Leak included excruciating levels of head pain, rendering Mr. Millman unable to sit upright, let alone stand (e.g., even something as simple as talking caused intense pain), nausea, lightheadedness, blurry vision to the point where he could only see out of one eye (requiring multiple ophthalmologist visits), and resulting depression.

19. As it took nine blood and fibrin glue patches over roughly fourteen months to fix Mr. Millman's CSF leak, his body moved into a state of rebound intracranial hypertension, meaning that his body adjusted to the ongoing leak by overproducing spinal fluid, even after the leak was fixed. This overproduction led to increased pressure throughout Mr. Millman's head and spine.

20. As a result of his medical issues, Mr. Millman started receiving short-term disability benefits on or about October 2019 and long-term disability benefits on or about April 2020.

### Education and Work Experience

21. After earning his MBA cum laude from Dartmouth, Mr. Millman was recruited to join JP Morgan Chase's prestigious Management Associate Program, which is designed for future leaders of the company.

22. During his first two years at JP Morgan Chase ("Chase"), Mr. Millman completed four 6-month rotations in different corporate areas. Before each rotation, Mr. Millman received intensive, two-week training with the bank's senior leadership. Upon completion of the program, Mr. Millman was promoted from Associate to Vice President. Mr. Millman's promotion to Vice President after only two years of employment was nearly

6

unprecedented in the company.

23. Mr. Millman spent the next two years at JP Morgan Chase in Chase's retail arm, which has over 5,500 branches and 60,000 employees. Mr. Millman directed various sectors of the business, including a highly confidential project where he was tasked with investigating the actions of an advisor at JP Morgan Chase who had stolen twenty-two million dollars ($22,000,000) from his clients, which resulted in the advisor being sentenced to three to five years in prison.

24. Following two years in Chase retail, Mr. Millman moved to Chase Wealth Management and was promoted from Vice President to Executive Director. Mr. Millman was the first person of his nine-person Management Associate Program class to achieve this prestigious promotion. During this time, Mr. Millman worked approximately 60 hours per week.

25. During this time, Mr. Millman oversaw a 15-person team that focused on regulatory compliance and revenue generating projects.  After two years with Chase Wealth Management, Mr. Millman was recruited by BNY Mellon to establish and lead a group dedicated to interacting with regulators, which had become an area of expertise for him at JP Morgan Chase.

26. Mr. Millman was also very active in raising and caring for his children, which included, among many other things, coaching them in various youth sports activities, especially Little League, helping them with schoolwork and assisting in performing arts.

27. While at JP Morgan Chase and BNY Mellon, Mr. Millman worked an average of 60 hours per week and up to 80 hours when necessary. All of his roles at JP Morgan Chase and BNY Mellon involved traveling up to 20% of the time, sitting for 3-4 hours at a time, carrying 10-20 pounds of paper presentations, rapidly reviewing and understanding large amounts of information under heavy time constraints, and meeting in

person with various stakeholders for 50% to 90% of the day. Unfortunately, Mr.

Millman's disability made him unable to do any of these things.

**Defendants' Conspire to Deny Mr. Millman's Disability Claim**

Lincoln changed Mr. Millman's claim administrator to someone in "Group Protection"

28. On or about March 13, 2023, Lincoln replaced Chenta Kennedy ("Ms. Kennedy"),
who was Lincoln's Technical Claims Specialist handling Mr. Millman's claim, to Casey
Miranda ("Ms. Miranda"), who worked in Lincoln's Group Protection division.

29. Immediately after this change, Mr. Millman's relationship with Lincoln
deteriorated. Whereas Ms. Kennedy was helpful and considerate of Mr. Millman's
horrifying condition, Ms. Miranda showed no interest in understanding Mr. Millman's
health and actively looked for ways to disallow Mr. Millman's claim.

IME Requested to Review Only One-Half of Mr. Millman's Medical Records

30. Ms. Miranda spoke to Mr. Millman on March 13, 2023, and specifically told him
that she had no interest in learning or understanding about his prior or current condition.

31. On April 5, 2023, Ms. Miranda's own notes confirm both that i) Mr. Millman
needed two full months with no symptoms before he returned to work; and ii) Mr.
Millman's last flare up was in mid-February 2023.

32. On that same day – less than two months since his last symptoms – Ms. Miranda
determined that both an independent medical exam ("IME") and surveillance of Mr.
Millman were necessary to determine whether Mr. Millman was still disabled.

33. Importantly and consistent with her conduct to date, Ms. Miranda made this
determination without even investigating whether Mr. Millman's symptoms were
continuing (something Lincoln had done until Ms. Miranda took over).

34. On April 13, 2023, Ms. Miranda requested that ECN find a doctor to perform an

IME on Mr. Millman.

35. To that end, on April 17, 2023, ECN emailed Dr. Charles to request that he perform Mr. Millman's IME. ECN advised Dr. Charles that as part of the exam process, he would be paid to review ONLY one-half (50%) of Mr. Millman's extensive medical records. There can be no legitimate basis for ECN to have requested a review of ONLY 50% of Mr. Millman's medical records other than to limit their financial responsibility to Dr. Charles and to have predetermined the outcome of Dr. Charles' report. Therefore, the hiring of an IME, an alleged independent medical examiner, was not independent at all as Dr. Charles was told by ECN what they wanted the outcome of the report to be. If this were not the case, Dr. Charles would have been compensated to review Mr. Millman's entire medical record and would have been allowed to make an independent determination based on the medical, ethical and moral standards required by the Hippocratic Oath and his licensure as a medical practitioner.

36. Shortly thereafter, on April 19, 2023, Dr. Charles replied to ECN, advising it that he charges a set dollar amount per hour for the first ½ inch of medical records he needed to review, and a separate dollar amount per hour for every inch of medical records after that.[1]

37. This is notable because Mr. Millman's medical file was more than 1,600 pages and according to Dr. Charles' records, he spent 90 minutes reviewing those records. Given the

---

[1] The specific dollar amounts were redacted from the production of this information

details in his medical file, Dr. Charles could not have properly reviewed even half the records he was being paid to review in that time frame.

38. By May 1, 2023, Dr. Charles and ECN had agreed that Dr. Charles would conduct Mr. Millman's IME, which was then scheduled for June 2, 2023.

39. And, in spite of ECN's instructions to Dr. Charles to only review one-half of Mr. Millman's medical records (to which Dr. Charles agreed), in an attempt to try to cover itself, ECN's formal letter to Dr. Charles, dated May 11, 2023, states that "All reviewers must consider all of the medical information contained in the medical records sent for review."

<u>Ethos Fabricates Its Report and Video footage</u>

40. Concurrently with setting up Dr. Charles' sham IME, on April 25, 2023, Lincoln requested that Ethos perform surveillance of Mr. Millman, allegedly to determine the legitimacy of his injury; in fact, it was part of its plan to deny Mr. Millman's disability benefits.

41. Lincoln gave Ethos specific dates and times when it should conduct its surveillance, somehow obtaining non-public information about Mr. Millman and his family in order to provide Ethos with this information.

42. Lincoln's first requested surveillance date of Mr. Millman was May 4, 2023, at Mr. Millman's son's little league game. Although the details of Mr. Millman's son's little league (team rosters, schedule, etc.) is hidden behind a firewall, somehow Lincoln managed to determine his son's name and team, and the team's upcoming game schedule so that Ethos could try to "catch" Mr. Millman in his allegedly fraudulent claim.

43. To that end, on May 4, 2023, from 11am to 8pm, one of Ethos's investigators, believed to be Maxamilliano Rios, surveilled Mr. Millman. The surveillance included video footage of Mr. Millman's attendance at his son's little league game at Crossway Fields (a local baseball field).

44. Lincoln requested a report and the video footage from Ethos after the first day of surveillance.

45. On May 11, 2023, Ethos provided a report (the "First Ethos Report"), which was unsigned, along with a heavily edited version of the video footage, all designed to show that Mr. Millman was not disabled.

46. More specifically, the First Ethos Report stated, among other things:

   a) Mr. Millman left the game under his own power; and

   b) Mr. Millman "was observed walking without a limp[2]".

47. Despite Ethos' claim to the contrary, however, there are multiple different indicia that the alleged "facts" in the First Ethos Report were fabricated and that the video footage was heavily edited.

48. First, upon viewing the report and video footage, Mr. Millman immediately realized that neither accurately portrayed the events as they occurred that day as, among other things, he knew he had had to be helped off of the field before the game ended that day.

49. Accordingly, Mr. Millman hired an expert to review the video footage. That expert prepared a report which noted:

> "The video file is a composite of [30] individual recordings concatenated in a continuous stream. The majority of these segments exhibit consistency with

---

[2] Mr. Millman notes that he has never claimed his disability causes him to "limp" in any way.

11

selective redaction (the removal of material from the beginning and/or end of each individual recording)."

50. In other words, Mr. Rios (or someone else at Ethos) cut and pasted together his video, cherry-picking portions of the video to produce fraudulent evidence that Mr. Millman was completely healthy and not disabled.

51. Second, in spite of the fact that Mr. Millman was at the field for approximately 90 minutes that day, the video footage provided to Mr. Millman – which Ethos claimed contained the entirety of Mr. Millman's time at the field -- is only 40 minutes long.

52. As noted, the reason that portion of the tape is only 40 minutes long is because it was heavily edited to omit all instances that demonstrated Mr. Millman's disability. Fortunately, the editing was unsuccessful as it still showed Mr. Millman requiring assistance to get home before the end of the game.

53. Had Ethos' investigator not edited the entirety of Mr. Millman's attendance at the little league game, it would have shown:

    c) Mr. Millman doubled over in pain on more than one occasion;

    d) Mr. Millman needing help from another parent who physically supported him as he walked from the baseball field to his car in the middle of the game as his pain was so severe;

    e) Mr. Millman needing help from parents to get into his car;

    f) A parent driving Mr. Millman home from the baseball field;

54. When confronted with evidence that the video footage had been heavily edited, Ethos fabricated explanations as to why this was not the case, most notably claiming that the investigator's view was blocked at certain times, during which he turned off the video footage.

55. However, the investigator's view could not have been blocked while taking his video, as there are no trees, bushes, or any other natural or man-made objects between where the investigator must have been standing when taking the video and where Mr. Millman was on the little league field as the picture below (which is taken from almost the exact vantage point of Mr. Rios' video) shows:



56. Yet, when requested to correct its report, Ethos held fast to its lies to Mr. Millman that the video footage was unedited and the report was accurate, despite overwhelming evidence to the contrary.

<u>Dr. Charles' Finds Mr. Millman **Is** Disabled</u>

57. Mr. Millman went to see Dr. Charles on June 2, 2023, for an IME (during which visit he was surveilled by a different Ethos investigator, Trevor Dwyer).

58. Prior to that time, ECN sent Mr. Millman's medical file to Dr. Charles.

13

59. After his examination of Mr. Millman, on June 2, 2023, Dr. Charles sent a draft letter to ECN (the "First IME Opinion"), in which Dr. Charles confirmed, based on his exam of Mr. Millman and his review of Mr. Millman's medical records, that Mr. Millman was disabled.

60. The First IME Opinion stated, among other things, in response to the question as to whether or not Mr. Millman could work an eight-hour day:

> "No.  Whether it be sedentary or physical, he [Mr. Millman] cannot work an eight-hour day.  He can exert force, but he cannot work an eight-hour day.  He cannot do a sedentary job.  He cannot concentrate and cannot focus.  He has severe pain every day."

61. In response to the question "Are the subjective complaints substantiated by the medical evidence provided", the First IME Opinion stated: "Yes."

62. The First IME Opinion also stated:

> "The severity, chronicity, and lack of targeted treatment will not allow this claimant [Mr. Millman] to work in any capacity.  He is completely restricted in performing any type of job because of the severity of his headaches…"

And:

> "He cannot do daily activities with any mental exertion of any degree…He cannot exert himself because the pain in his head is extremely severe.  He cannot focus or use his brain to concentrate and do any type of mental activity."

63. On June 13, 2023, ECN emailed Dr. Charles noting that the First IME Opinion had gone through ECN's "QA process and, upon review, it is noted that the following revisions

14

need to be made", attaching a marked up copy of the First IME Opinion which discovery has not yet uncovered.

64. ECN sent the revised IME Opinion to Lincoln at 3:23 PM on June 15, 2023, presumably after Dr. Charles made the changes ECN requested to his opinion.

<u>Lincoln, ECN and Dr. Charles Conspire to Find Mr. Millman *Is Not* Disabled</u>

65. Lincoln managed to review and synthesize the First IME Opinion instantaneously, because that very same minute, at 3:23 PM on June 15, 2023, Lincoln emailed ECN to ask how the First Ethos Report and video footage factored into Dr. Charles' findings.

66. Lincoln was able to do this because Lincoln had orchestrated the entire series of events, including Ethos' surveillance of Mr. Millman, so that Dr. Charles would find that Mr. Millman was not disabled, which would allow Lincoln to deny Mr. Millman his disability benefits. When it saw that the First IME Opinion said that Mr. Millman was disabled, Lincoln knew something in its plan had gone wrong.

67. Consistent with Lincoln's plan for the IME report to find Mr. Millman not disabled, Lincoln's own claim file noted that on June 21, 2023 (six days after receiving the First IME Opinion) Mr. Millman called Ms. Miranda to get an update on the results of his IME, and Ms. Miranda lied to him and told him that Lincoln was still awaiting receipt of the report.

68. During this same time period, Lincoln and ECN were scrambling to get an IME report that found Mr. Millman was not disabled, and Dr. Charles needed additional pressure before he would change his opinion. Indeed, Lincoln and ECN could not even agree amongst themselves about how best to go about it.

69. On June 16, 2023, Dr. Charles' assistant emailed ECN advising them that:

"Dr. Charles would be glad to review the video surveillance and issue an addendum for $[ ].[3] However, since chronic refractory migraine patients' disability can fluctuate, unless the video shows him playing tennis or swimming in the beach, I'm unlikely to change my opinions in this case."

70. On June 22, 2023, ECN emailed Dr. Charles back, noting that ECN and Lincoln were discussing the matter, and did not want him to issue an addendum; instead, Lincoln wanted him to amend his report.

71. And, on June 23, 2023, ECN emailed Dr. Charles the First Ethos Report and edited video footage.

72. On June 28, 2023, at 10:18 a.m., Dr. Charles emailed ECN an amended IME report.

73. On June 28, 2023, at 12:02 p.m., ECN emailed Dr. Charles back asking him not to send an amended version of the First IME Opinion, but instead to send the revision in an addendum (changing its mind from what it had told him just six days earlier, that it did not want an addendum).

74. On June 28, 2023, at 12:30 p.m., Dr. Charles emailed ECN back and stated:

I cannot separate out the IME from an addendum in [sic] this case. It's going to sound like 'by the way now that I saw the video surveillance, I changed my opinion on disability.'

75. Of course, as events show, that is ***exactly*** what Dr. Charles did after being pressured by ECN and Lincoln.

---

[3] Plaintiffs' version of this document has this missing information redacted.

76. At 1:05 PM on June 28, 2023, ECN emailed back Dr. Charles and told him it had to be an addendum, even if it changed his opinion, because Lincoln had already seen the initial report, so it could not be changed.

77. At 4:45 PM on June 28, 2023, ECN notified Lincoln that it had the new report but needed to send it back to Dr. Charles for corrections.

78. Finally, Lincoln's plan had succeeded, and on June 29, 2023, Dr. Charles provided ECN with a June 28, 2023, letter (the "Second IME Opinion") in which, based solely on his review of the video footage, he completely reversed his position from his First IME Opinion and now claimed that Mr. Millman was not disabled.

79. Dr. Charles completely changed his conclusions in the Second IME Opinion, despite the fact that the only new information provided to him between his two opinions were an Ethos Report and edited video footage, and in spite of his previously telling ECN that he would not change his opinion based upon video footage.

80. More specifically, the Second IME Opinion states that Mr. Millman was "having an active time assisting his son by carrying multiple objects, interacting with other parents and coaches, doing normal complex maneuvers with his hands, driving, loading and unloading his trunk**...[and] [a]t the end of this sunny active day, he is smiling with no loss of energy**". (Emphasis added).

81. Considering that nothing showed Mr. Millman "smiling with no loss of energy" at the end of a "sunny active day," not even the edited video footage, it is doubtful that Dr. Charles even reviewed the Ethos Report or video footage sent to him at all.

82. Instead, due to the pressure he received from ECN and indirectly from Lincoln, he simply changed his opinion to find Mr. Millman disabled based upon the video footage.

83. Dr. Charles' complete reversal of his opinion on Mr. Millman's disability is set forth more clearly in the chart below:

| FIRST IME OPINION | SECOND IME OPINION |
|---|---|
| The severity, chronicity, and lack of targeted treatment will not allow this claimant [Mr. Millman] to work in any capacity. He is completely restricted in performing any type of job because of the severity of his headaches…. | [Mr. Millman] can work in any capacity. He is not restricted from performing any type of job because of the severity of his headaches. |
| No. Whether it be sedentary or physical, [Mr. Millman] cannot work an eight-hour day. He can exert force, but he cannot work an eight-hour day. He cannot do a sedentary job. He cannot concentrate and cannot focus. He has severe pain every day. | Yes. Whether it be sedentary or physical, [Mr. Millman] can work an eight-hour day. He can exert force, and he can concentrate and focus. |
| He cannot do daily activities with any mental exertion of any degree…He cannot exert himself because the pain in his head is extremely severe. He cannot focus or use his brain to concentrate and do any type of mental activity. | He can do daily activities with any mental exertion of any degree…He can exert himself in spite of his headaches. He can focus or use his brain to concentrate and do any type of mental activity. |

84. Armed with the Second IME Opinion, Lincoln took the necessary steps to deny Mr. Millman's disability claim.

**Defendants Refuse to Acknowledge Their Misconduct**

85. Lincoln's steps to deny Mr. Millman's benefits entailed more than just having Ethos' fabricated report and getting Dr. Charles to find Mr. Millman disabled. Now, Lincoln had to get the Second IME Opinion past Mr. Millman's own doctors to complete its own paperwork.

18

86. To that end, Lincoln claimed that on July 3, 2023, it sent letters containing copies of the Second IME Opinion and an Ethos Surveillance Report to two of Mr. Millman's doctors, Dr. Berk and Dr. Goldberg, allegedly seeking comment from them. Lincoln claimed it obtained proof that both doctors had received its letters.

87. However, Lincoln sent Dr. Berk's letter to a hospital where he had not worked for more than six months, even after Mr. Millman had previously provided Lincoln with Dr. Berk's correct contact information on multiple occasions, including as recently as March 28, 2023.

88. Dr. Goldberg's staff searched his office thoroughly and found no record of ever receiving anything from Lincoln on that date.

89. Without receiving any response from Mr. Millman's doctors to its letters – because they were never sent such letters – Lincoln was able to rely upon the Second IME Opinion to deny Mr. Millman's disability benefits, which it did on July 25, 2023.

90. Upon learning that his disability benefits were being denied, Mr. Millman immediately called Ms. Miranda and after being told that his doctors never responded to the requests sent to them, he asked Ms. Miranda for copies of the confirmations that Dr. Berk and Dr. Goldberg received these letters; she refused to provide it.

91. Indeed, Ms. Miranda refused even to provide Mr. Millman with copies of the letters themselves, let alone documents confirming their receipt by Mr. Millman's doctors.

92. Mr. Millman was able to obtain copies of the letters from someone else at Lincoln that same day, July 25, 2023.

93. He immediately sent them to his doctors, both of whom then responded to Lincoln's letters on the very same day, noting that the Second IME Opinion was completely baseless.

94. Ms. Miranda, not to be deterred, intentionally and recklessly refused to even consider Mr. Millman's doctor's responses in the decision to terminate Mr. Millman's disability benefits. Of course, this is not surprising: had she considered them, Lincoln would not have been able to terminate Mr. Millman's benefits.

95. Ms. Miranda was not done either. As late as July 25, 2023 (the date Lincoln denied Mr. Millman's disability claim), and many times before that, Ms. Miranda's notes in Mr. Millman's file stated that Mr. Millman had not exhibited any symptoms since at least mid-February 2023.

96. However, those same notes also state that Mrs. Millman advised Ms. Miranda in May 2023 when Ms. Miranda called Mr. Millman, that Mr. Millman "was not able to get out of bed [and speak to her] since his head hurt so badly".

97. Relatedly, Ms. Miranda ignored Mr. Millman's April 25, 2023, email in which he advised her that he was taking Nabumetone to treat severe head pain.

98. Again, with her mission parameters in hand, Ms. Miranda was not going to let something as trivial as facts prevent her from finding Mr. Millman was not disabled.

99.    It is clear from the timetable of Ms. Miranda's involvement in Mr. Millman's case that she was brought on with the sole purpose of denying his disability claim.

100.    Mr. Millman had been receiving disability benefits from Lincoln since 2020.

101.    Ms. Miranda, who is in Lincoln's Group Protection division, was put on Mr. Millman's case on or about March 13, 2023. At this time, she told Mr. Millman that she was a Technical Claims Specialist, exactly like Ms. Kennedy was, even though she was not.

102.    It took her just four short months to have Lincoln deny Mr. Millman's disability benefits.

Ethos Also Refuses to Acknowledge Its Deceit

103.    Upon the denial of his claim, Mr. Millman sought out the specifics as to why his claim was being denied. After learning that his doctors failed to respond to information requests (which they never received), Mr. Millman also learned of the existence of a surveillance report and video footage.

104.    Mr. Millman promptly sought copies of both the report and video footage.

105.    Ultimately, Lincoln provided Mr. Millman with a copy of the edited video footage and a second report by Ethos, dated June 6, 2023 (the "Second Ethos Report") which was different from the report it sent to ECN and Dr. Charles.

106.    Upon Mr. Millman's review of the Second Ethos Report and video footage, it was clear to him that neither the video footage nor the Second Ethos Report accurately reflected the events Ethos' investigator claimed to have witnessed.

107.    To that end, Mr. Millman requested Ethos provide him with an unedited version of the video footage and the name(s) and license number(s) of the investigator(s). Despite repeated requests for the information, Ethos refused.

108.    More specifically, on September 29, 2023, Mr. Millman's disability counsel, Jason Newfield ("Mr. Newfield"), first requested that Ethos provide him with a copy of the unedited video footage.

109.    On October 2, 2023, Madeline Cronin at Ethos replied to Mr. Newfield's request, stating "Good morning, in regard to your question regarding the video obtained on May 4, 2023, this video was not edited in any way."

110.    Mr. Newfield wrote again to Ethos on November 28, 2023, and demanded the unedited video footage and related information.  Ethos never responded to this demand letter.

111.    Knowing that the video footage did not accurately portray the events depicted in it, Mr. Millman was left to prove that Ethos was lying.

112.    To that end, Mr. Millman hired an expert – Audio Evidence Lab -- to review the video footage to determine if it had been doctored.

113.    Additionally, Mr. Millman, with the assistance of Mrs. Millman, spent significant time and effort piecing together the events at the Little League game that day as he knew the video footage did not accurately reflect what had happened there.

114.    This included gathering statements from approximately 30 witnesses confirming the inaccuracies in the surveillance report and video footage.

115.    Audio Evidence Lab reviewed the video footage and issued a report stating that the video footage was comprised of at least 30 individual segments, which were selectively redacted, i.e., material from the beginning or end of the segments was removed.

116.    Having received no response to his prior two demands for the video footage, on January 11, 2024, and now with Audio Evidence Lab's report confirming the inauthenticity of the video footage, Mr. Newfield wrote again at Ethos, advising it of Audio Evidence Lab's findings with respect to the edited video footage, and demanding the original video footage, the investigator's name(s) and any of the investigator's notes.

117.    In response, on January 11, 2024, Ms. Cronin at Ethos stated:

> "Ethos will not be providing any further information/documents until a formal subpoena is received in person by an Ethos representative from your office.  After receiving the subpoena and [after] our client Lincoln Financial has given us

authorization to send the requested documentation, you will be provided with the requested information/documents."

Ms. Cronin did not even deny that the report and video footage were fraudulent.

118.    Knowing full well that the video footage was intentionally misleading, Ethos and Lincoln tried to hide their reprehensible misconduct behind a veil of secrecy, compounding Mr. Millman's damages even more extensively.

## Ethos' Misconduct Also Violates New York's Law Governing Private Investigators

119.    New York's General Business Law (the "GBL") governs the licensing and conduct of private investigators in New York.

120.    Article 7 of the GBL is replete with requirements that private investigators must be "honest, of good character and competent" and any private investigator who makes a false report "shall be guilty of a misdemeanor."

121.    In addition, Section 74 of Article 7 of the GBL not only requires all private investigators to be bonded but also provides for a private right of action against the private investigator on such bond for damages suffered by any willful, malicious or wrongful act, such as Ethos' misconduct here.

## Plaintiffs' Damages

122.    In addition to the costs related to investigating and uncovering Defendants' fraudulent conduct here, Plaintiffs also suffered significant additional monetary, physical, and emotional damages as a result of Defendants' egregious misconduct.

123.    Mr. Millman is suffering from severe emotional distress to the point that he is afraid to leave his house for fear that someone will be watching him, and his disability

benefits will be taken away based on a completely fictitious report, like Ethos' here, and upon a baseless opinion by a supposedly independent doctor who was told to only review half of Mr. Millman's file and who was somehow convinced by ECN to change his findings in spite of his prior insistence that there was no basis for doing so.

124.    Mr. Millman's fears were well founded, given that private investigators have been lying in wait outside of Mr. Millman's house multiple times even after this lawsuit was filed.

125.    More specifically, Plaintiffs' damages include, without limitation, the following:

    a.  Special damages to date of at least:

        i.  $1,875 paid to Audio Evidence Lab to provide expert analysis of the doctored video footage;

        ii.  legal fees to appeal Mr. Millman's disability insurer's ruling including the video footage, obtaining and reviewing medical records (to enter into report), preparation of the appeal and filing of same in an amount currently totaling $28,125;

        iii.  Mrs. Millman's lost earnings given she could not work because she had to take care of Mr. Millman and their children, and work on the appeal of the denial of his benefits, now totaling approximately $500,000 and

        iv.  $31,000 in interest on monetary loans Mr. Millman needed to offset the loss of income from the denial of the disability coverage;

        v.  Additional childcare costs; and

      vi.   Additional doctors' visits.

b.  And additional damages in an amount to be determined at trial, but in excess of $8,000,000 due to:

      vii.   increased physical and emotional pain for Plaintiff due to the video footage providing the basis for the denial of Mr. Millman's insurance benefits;

     viii.   a stay in the Mayo Clinic and resulting change in Mr. Millman's care protocols as prescribed by the Mayo Clinic, occasioned by the damages caused by Defendants;

      ix.   an increase in Mr. Millman's medications to treat his symptoms;

      x.   exacerbation of Mr. Millman's post-traumatic stress disorder in that the mere thought of him doing anything left him fearful that he was being videotaped and would subsequently have his benefits taken away again;

      xi.   loss of consortium; and

      xii.   Mr. Millman's need for additional psychological help due to the unrelenting and intolerable stress – including without limitation worsening headaches, increase in prescription drug usage, lack of sleep and overwhelming financial concerns – caused by Defendant's misconduct.

126.    None of Plaintiffs aforementioned damages are related to or recoverable through Mr. Millman's disability benefits.

127.    Mr. Millman submitted, through his disability attorney, an appeal consisting of medical records, expert reports, affidavits, and a legal brief to Lincoln disability insurer in January 2024.

128.    As part of that appeals process, in 2024, Lincoln had another doctor examine Mr. Millman's file and Lincoln sent that doctor copies of both the Second IME Opinion, as well as an Ethos surveillance report and edited video footage.

129.    That doctor's report, finding Mr. Millman was disabled, noted among other things that:

> The surveillance is consistent with observing the claimant exit the playing field before the activity was completed and documents his need for physical assistance to ambulate across a baseball field. The information is consistent with an individual who has had a good but incomplete response to treatment and who was attempting to be involved in regularly scheduled community activities with his children however he was not able to complete this activity. Therefore it is my opinion that the surveillance reinforced the conclusion that the claimant continues to require medically necessary restrictions and limitations as his pain related symptoms are of the severity and frequency that they do not allow him to perform vocational or prevocational activities on a regular and predictable basis.

130.    On March 12, 2024, Mr. Millman's disability insurer reinstated Mr. Millman's benefits under his disability policy, admitting its prior error.

## AS AND FOR A FIRST CLAIM
### (Prima Facie Tort against Ethos)

131.    Plaintiffs repeat, reallege and incorporate the factual allegations contained in the preceding paragraphs as if more fully set forth herein.

132.    Ethos' preparation of the fraudulent First Ethos Report which purposely ignored even those sections of the video footage that showed Mr. Millman needing to be helped off of the baseball field was an intentional act by Ethos designed to harm Plaintiffs.

133.     Ethos' selective editing of the video footage to try to avoid showing Mr. Millman's disability to induce the discontinuance of Mr. Millman's disability benefits was an intentional act by Ethos designed to harm Plaintiffs.

134.     Ethos' failure to have its investigator(s) sign the Report further shows Ethos' acts were intentional and without any excuse or justification.

135.     Ethos' steadfast denials about the fact that the Report was purposefully misleading and that the video footage was edited, even after being provided incontrovertible evidence of these facts, were done with disinterested malevolence.

136.     The creation and use of the Report and video footage were otherwise lawful acts but for Ethos' misconduct set forth herein.

137.     Ethos' intentional acts in preparing the fraudulent Report and edited video footage were directly responsible for damaging Plaintiffs.

138.     Plaintiff has been damaged as set forth in more fully in Paragraph 125 herein.

139.     Plaintiffs should be awarded damages, plus pre- and post-judgment interest thereon, that are the direct result of Ethos' misconduct in an amount to be determined at trial but in excess of eight million dollars ($8,000,000.00).

140.     Plaintiffs are entitled to punitive damages against Ethos given the wanton and willful misconduct exhibited by Ethos that intentionally harmed Plaintiffs in an amount to be determined at trial.

## **AS AND FOR A SECOND CLAIM**
(Intentional Infliction of Emotional Distress against Ethos)

141.     Plaintiffs repeat, reallege and incorporate the factual allegations contained in the preceding paragraphs as if more fully set forth herein.

27

142.     Ethos' conduct in i) creating the Report and edited video footage; ii) and steadfastly refusing to admit the Report was misleading and the video footage edited was extreme and outrageous.

143.     Ethos' outrageous conduct was intended to cause or recklessly disregarded the probability that it would cause Mr. Millman severe emotional distress. As a result of Ethos' conduct, Mr. Millman suffered and continues to suffer severe emotional distress.

144.     Ethos' reprehensible fabrication of the Report and video footage had the intended effect of causing the discontinuance of Mr. Millman's disability benefits, which severely damaged Mr. Millman, causing an acute increase in Mr. Millman's physical and emotional pain and exacerbation of post-traumatic stress disorder to the point that Mr. Millman was (and still is) afraid to leave his house and a need for increased medication and multiple doctors' care to try to combat the damage caused by Ethos' deplorable misconduct.

145.     Plaintiff has been damaged as set forth in more fully in Paragraph 125 herein.

146.     Plaintiffs should be awarded damages, plus pre- and post-judgment interest thereon, that are the direct result of Ethos' aforementioned misconduct, in an amount to be determined at trial but in excess of eight million dollars ($8,000,000.00).

147.     Plaintiffs are also entitled to punitive damages against Ethos given the wanton and willful misconduct exhibited by Ethos that intentionally harmed Plaintiffs in an amount to be determined at trial.

## AS AND FOR A THIRD CLAIM
(Defamation against Ethos)

148.     Plaintiffs repeat, reallege and incorporate the factual allegations contained in the preceding paragraphs as if more fully set forth herein.

149.     Ethos' drafting and publishing of the Report and video footage was defamatory in that Ethos knew the facts alleged in the Report were false and misleading and that the video footage was purposefully misleadingly edited to portray Mr. Millman's disability claim as fabricated.

150.     Ethos published the Report and video footage when it shared it with, among others, Mr. Millman's disability insurer and Dr. Charles.

151.     The statements in the Report and the redacted version of the video footage were false and are defamatory *per se*.  In the event Ethos' defamatory statements are not considered defamatory *per se*, Mr. Millman alleges special damages as set forth more fully in paragraph 125(a) herein.

152.     Mr. Millman should be awarded damages, plus pre- and post-judgment interest thereon, that are the direct result of Ethos' defamatory conduct in an amount to be determined at trial but in excess of eight million dollars ($8,000,000.00):

153.     Mr. Millman is also entitled to punitive damages against Ethos given the wanton and willful misconduct exhibited by Ethos that intentionally harmed Mr. Millman in an amount to be determined at trial.

**AS AND FOR A FOURTH CLAIM**
(Negligent Infliction of Emotional Distress against Ethos)

154.     Plaintiffs repeat, reallege and incorporate the factual allegations contained in the preceding paragraphs as if more fully set forth herein.

155.     Ethos owed Mr. Millman a duty to not purposely lie and deceive when it prepared its Report and video footage. Ethos also owed Mr. Millman a duty to comply with New York's General Business Law requirements governing private investigators, including being honest, of good character, and not preparing false reports.

156.     Ethos breached this duty when it dishonestly prepared a report and video footage designed to make Mr. Millman's disability claim appear fraudulent.

157.     Ethos' misconduct caused and continues to cause Mr. Millman to fear for his physical safety and has caused him severe emotional distress.

158.     Ethos' misconduct caused Mr. Millman's emotional injuries.

159.     Plaintiffs have been damaged as set forth in more fully in Paragraph 125 herein.

160.     Plaintiffs should be awarded damages, plus pre- and post-judgment interest thereon, that are the direct result of Ethos' negligent infliction of emotional distress in an amount to be determined at trial but in excess of eight million dollars ($8,000,000.00).

161.     Mr. Millman is also entitled to punitive damages against Ethos given the wanton and willful misconduct exhibited by Ethos that intentionally harmed Mr. Millman in an amount to be determined at trial.

## AS AND FOR A FIFTH CLAIM
(Violation of New York's General Business Law § 74 against Ethos)

162.     Plaintiffs repeat, reallege and incorporate the factual allegations contained in the preceding paragraphs as if more fully set forth herein.

163.     As a licensed private investigator in New York State, Ethos was required to post a bond of $10,000.00.

164.     Pursuant to New York's GBL §74, Mr. Millman is entitled to bring an action against Ethos on the bond for its willful, malicious and wrongful conduct.

165.     Ethos' fraudulent preparation of the Report and video footage in order to cause Mr. Millman to lose his disability benefits was willful, malicious and wrongful in violation of New York's GBL §74.

166.     Ethos' misconduct directly caused Mr. Millman damages as set forth more fully in Paragraph 125 herein.

167.     Mr. Millman is entitled to damages in an amount to be determined at trial, but at least the amount of the bond Ethos was required to post in connection with its license as a private investigator in New York State.

## AS AND FOR A SIXTH CLAIM
(Defamation Against Dr. Charles)

168.     Plaintiffs repeat, reallege and incorporate the factual allegations contained in the preceding paragraphs as if more fully set forth herein.

169.     Dr. Charles' June 28, 2023 letter, changing his medical opinion of Mr. Millman from disabled to not disabled, was a defamatory statement in that Dr. Charles knew the facts stated in his June 28, 2023 letter were false and misleading, and he purposefully changed his opinion of Mr. Millman's disability to find him not disabled even though he knew this was a blatant fabrication and that the opposite was true.

170.     Dr. Charles also fabricated facts about Mr. Millman in his June 28, 2023, letter, e.g., that "[a]t the end of this sunny active day, [Mr. Millman] is smiling with no loss of energy", even though the video footage upon which Dr. Charles based his opinion in his June 28, 2023, letter showed no such thing.  In fact, the video footage showed Mr. Millman being helped off the baseball field.

171.     Dr. Charles published the June 28, 2023, letter when he shared it with, among others, Lincoln and ECN and knew that ECN and Lincoln were going to – and did – republish the letter.

172.     The statements in the June 28, 2023, letter were false and are defamatory *per se*. In the event Dr. Charles' defamatory statements are not considered defamatory *per se*, Mr. Millman alleges special damages as set forth more fully in paragraph 125(a) herein.

173.     Mr. Millman should be awarded damages, plus pre- and post-judgment interest thereon, that are the direct result of Dr. Charles' defamatory conduct in an amount to be determined at trial but in excess of eight million dollars ($8,000,000.00):

174.     Mr. Millman is also entitled to punitive damages against  Dr. Charles given the wanton and willful misconduct exhibited by Dr. Charles that intentionally harmed Mr. Millman in an amount to be determined at trial.

## AS AND FOR A SEVENTH CLAIM
(Prima Facie Tort against Dr. Charles)

175.     Plaintiffs repeat, reallege and incorporate the factual allegations contained in the preceding paragraphs as if more fully set forth herein.

176.     Dr. Charles' June 28, 2023, letter changing his medical opinion of Mr. Millman from disabled to not disabled was an intentional act by Dr. Charles designed to harm Plaintiffs.

177.     Dr. Charles' failure to review all of Mr. Millman's medical records and failure to review the video before changing his opinion was intentional and without any excuse or justification.

178.     Dr. Charles' change of his medical opinion of Mr. Millman from disabled to not disabled without factual support or basis, and the addition of made-up facts about Mr. Millman smiling at the end of a sunny day, which Dr. Charles stated were in Ethos' edited video footage, even though they were not, was done with disinterested malevolence.

179.     The drafting and issuance of Dr. Charles' June 28, 2023, letter was an otherwise lawful act but for Dr. Charles' misconduct set forth herein.

180.    Dr. Charles' intentional acts in preparing the fraudulent June 28, 2023, letter was directly responsible for damaging Plaintiffs.

181.    Plaintiffs have been damaged as set forth in more fully in Paragraph 125 herein.

182.    Plaintiffs should be awarded damages, plus pre- and post-judgment interest thereon, that are the direct result of Dr. Charles' misconduct in an amount to be determined at trial but in excess of eight million dollars ($8,000,000.00).

183.    Plaintiffs are entitled to punitive damages against Dr. Charles given the wanton and willful misconduct exhibited by Dr. Charles that intentionally harmed Plaintiffs in an amount to be determined at trial.

**AS AND FOR AN EIGHTH CLAIM**
(Intentional Infliction of Emotional Distress against Dr. Charles)

184.    Plaintiffs repeat, reallege and incorporate the factual allegations contained in the preceding paragraphs as if more fully set forth herein.

185.    Dr. Charles' misconduct in changing his medical opinion to find Mr. Millman disabled when he knew Mr. Millman, was, in fact, disabled was extreme, outrageous and broke the Hippocratic code he took to maintain the highest standard of ethical conduct.

186.    Dr. Charles' outrageous conduct was intended to cause or recklessly disregarded the probability that it would cause Mr. Millman severe emotional distress and it did cause Mr. Millman severe emotional distress, as just hours before issuing his fraudulent letter, he advised ECN that a video footage of Mr. Millman would not change his opinion, and because Dr. Charles' June 28, 2023 letter stated that "[a]t the end of this sunny active day, [Mr. Millman] is smiling with no loss of energy", even though the video footage does not show Mr. Millman smiling at the end of the day.

187.     Dr. Charles' reprehensible changing of his opinion with regard to Mr. Millman's disability had the intended effect of causing the discontinuance of Mr. Millman's disability benefits, which severely damaged Mr. Millman, causing an acute increase in Mr. Millman's physical and emotional pain, exacerbation of post-traumatic stress he suffers from to the point that Mr. Millman was (and still is) afraid to leave his house and a need for increased medication and multiple doctors' care to try to combat the damage caused by Dr. Charles' deplorable misconduct.

188.     Plaintiff has been damaged as set forth in more fully in Paragraph 125 herein.

189.     Plaintiffs should be awarded damages, plus pre- and post-judgment interest thereon, that are the direct result of Dr. Charles' aforementioned misconduct, in an amount to be determined at trial but in excess of eight million dollars ($8,000,000.00).

### AS AND FOR A NINTH CLAIM
(Negligent Infliction of Emotional Distress against Dr. Charles)

190.     Plaintiffs repeat, reallege and incorporate the factual allegations contained in the preceding paragraphs as if more fully set forth herein.

191.     Dr. Charles owed Mr. Millman a duty to purposely not lie and/or deceive when he issued his June 28, 2023, letter.

192.     Dr. Charles breached this duty when he dishonestly issued his June 28, 2023, letter opining that Mr. Millman was not disabled after expressing the exact opposite opinion just weeks earlier that Mr. Millman was disabled, without any factual basis for doing so, so as to make Mr. Millman's disability claim appear fraudulent.

193.     Dr. Charles' misconduct caused and continues to cause Mr. Millman to fear for his physical safety and has caused him severe emotional distress.

194.     Dr. Charles' misconduct caused Mr. Millman's emotional injuries.

195.    Plaintiffs have been damaged as set forth more fully in Paragraph 125 herein.

196.    Plaintiffs should be awarded damages, plus pre- and post-judgment interest thereon, that are the direct result of Dr. Charles' negligent infliction of emotional distress in an amount to be determined at trial but in excess of eight million dollars ($8,000,000.00).

197.    Mr. Millman is also entitled to punitive damages against Dr. Charles given the wanton and willful misconduct exhibited by Dr. Charles that harmed Mr. Millman in an amount to be determined at trial.

### AS AND FOR A TENTH CLAIM
(Aiding and Abetting Against Dr. Charles)

198.    Plaintiffs repeat, reallege and incorporate the factual allegations contained in the preceding paragraphs as if more fully set forth herein.

199.    Both Lincoln and ECN committed tortious acts against Plaintiffs.

200.    Dr. Charles knew that both Lincoln and ECN insisted that he amend the results of his alleged "independent" medical exam to find that Mr. Millman was not disabled, after Dr. Charles initially found that Mr. Millman was disabled.

201.    Dr. Charles provided substantial assistance to Lincoln and ECN by agreeing to change the findings of his "independent" medical exam to find that Mr. Millman was not disabled even though Dr. Charles had found him disabled just weeks earlier and had advised ECN and Lincoln that video footage would not change his opinion, even though video footage was the only new record Dr. Charles could have reviewed between the time he issued his initial determination and the time he changed it to find Mr. Millman disabled.

202.    Dr. Charles' substantial assistance allowed ECN and Lincoln to commit their tortious acts against Plaintiffs.

203.    As a direct and proximate cause of Dr. Charles' provision of substantial assistance to Lincoln's and ECN's tortious conduct, Mr. Millman was damaged as set forth more fully in paragraph 126 herein.

204.    Plaintiffs should be awarded damages, plus pre- and post-judgment interest thereon, that are the direct result of Dr. Charles' aiding and abetting in an amount to be determined at trial but in excess of eight million dollars ($8,000,000.00).

205.    Mr. Millman is also entitled to punitive damages against Dr. Charles given the wanton and willful misconduct exhibited by Dr. Charles when he aided and abetted the misconduct that harmed Mr. Millman in an amount to be determined at trial.

### AS AND FOR AN ELEVENTH CLAIM
(Aiding and Abetting Against Lincoln)

206.    Plaintiffs repeat, reallege and incorporate the factual allegations contained in the preceding paragraphs as if more fully set forth herein.

207.    ECN and Dr. Charles all committed tortious acts against Plaintiffs.

208.    Dr. Charles' tortious acts included his intentionally changing his opinion on Mr. Millman's disability despite admitting he had no basis to do so and defaming Mr. Millman, and ECN's included it deliberately helping Lincoln to get Dr. Charles to change his opinion on Mr. Millman's disability despite knowing he had no basis to do so, and defaming Mr. Millman.

209.    Lincoln provided substantial assistance to ECN and Dr. Charles tortious conduct by purposely only providing them with the First Ethos Report and edited video footage, even though Lincoln knew both that there was a later version of the report and that the report and video footage were intentionally edited and prepared to show that Mr. Millman was not disabled.

210.    As a direct and proximate result of Lincoln's substantial assistance to Dr. Charles' and ECN's tortious conduct, Mr. Millman was damaged as set forth more fully in paragraph 125 herein.

211.    Plaintiffs should be awarded damages, plus pre- and post-judgment interest thereon, that are the direct result of Lincoln's aiding and abetting in an amount to be determined at trial but in excess of eight million dollars ($8,000,000.00).

212.    Mr. Millman is also entitled to punitive damages against Lincoln given the wanton and willful misconduct exhibited by Lincoln when it aided and abetted the misconduct that harmed Mr. Millman in an amount to be determined at trial.

### AS AND FOR A TWELFTH CLAIM
(Defamation Against Lincoln)

213.    Plaintiffs repeat, reallege and incorporate the factual allegations contained in the preceding paragraphs as if more fully set forth herein.

214.    Lincoln republished Dr. Charles' June 28, 2023, letter when it sent it to yet another doctor in February 2024, in the hopes that Dr. Charles' letter would convince the other doctor to find Mr. Millman disabled, and Lincoln knew when it sent Dr. Charles' letter that his finding that Mr. Millman was not disabled was untrue.

215.    The statements in Dr. Charles' January 28, 2023, letter were false and are defamatory *per se*.  In the event the defamatory statements in Dr. Charles' June 28, 2023, letter are not considered defamatory *per se*, Mr. Millman alleges special damages as set forth more fully in paragraph 125(a) herein.

216.    Mr. Millman should be awarded damages, plus pre- and post-judgment interest thereon, that are the direct result of Lincoln's defamatory conduct in an amount to be determined at trial but in excess of eight million dollars ($8,000,000.00):

217.    Mr. Millman is entitled to punitive damages against Lincoln given the wanton and willful misconduct exhibited by Lincoln that intentionally harmed Mr. Millman in an amount to be determined at trial.

**AS AND FOR A THIRTEENTH CLAIM**
(Respondent Superior/Vicarious Liability Against Lincoln)

218.    Plaintiffs repeat, reallege and incorporate the factual allegations contained in the preceding paragraphs as if more fully set forth herein.

219.    Ethos, ECN and Dr. Charles were all agents of Lincoln.

220.    In the course of their acting as agents for Lincoln, each of Ethos, ECN and Dr. Charles committed tortious acts against Plaintiffs.  All such tortious actions were taken within the scope of Ethos', ECN's and Dr. Charles' duties as agents for Lincoln.

221.    Each of Ethos', ECN's and Dr. Charles' tortious acts were in furtherance of Lincoln's interests.

222.    As set forth herein Lincoln controlled the outcome and results of the work that Ethos, ECN and Dr. Charles performed on Lincoln's behalf so that Lincoln would have a basis to deny Mr. Millman's disability benefits.

223.    Accordingly, Lincoln is liable for the torts committed against Plaintiffs by Ethos, ECN and Dr. Charles.

224.    As a result of Ethos', ECN's and Dr. Charles' tortious conduct, Plaintiffs were damaged as set forth more fully in paragraph 125 herein.

225.    Plaintiffs should be awarded damages, plus pre- and post-judgment interest thereon against Lincoln in an amount to be determined at trial but in excess of eight million dollars ($8,000,000.00).

## AS AND FOR A FOURTEENTH CLAIM
(Intentional Infliction of Emotional Distress against Lincoln)

226.    Plaintiffs repeat, reallege and incorporate the factual allegations contained in the preceding paragraphs as if more fully set forth herein.

227.    Lincoln's misconduct in intentionally denying Mr. Millman's disability benefits based upon fraudulent information, which information Lincoln helped create, was extreme and outrageous.

228.    Lincoln's outrageous conduct was intended to cause or recklessly disregarded the probability that it would cause Mr. Millman severe emotional distress, and it did cause Mr. Millman severe emotional distress.

229.    Lincoln's reprehensible conduct includes but is not limited to:

a.  Engineering Ethos' surveillance of Mr. Millman at his son's Little League game and doctoring the video footage and report of that surveillance to make Mr. Millman seem perfectly abled when Lincoln knew he was not;

b.  Making Mr. Millman afraid to leave his house for fear that in doing so, he would again lose his disability benefits;

c.  Continuing surveillance of Mr. Millman even after being made aware of Ethos' misconduct;

d.  Having Dr. Charles change his opinion on Mr. Millman being disabled to find that he was not disabled, when it knew that he was, as evidenced by Lincoln's obvious surprise that Dr. Charles' First IME Opinion found Mr. Millman disabled and immediate (the very same minute it first received the First IME Opinion) response to ECN that it needed Dr. Charles to change his report;

    e.    Purposefully ignoring reports of Mr. Millman's pain and disability in order to find that he was not disabled;

    f.    Sending the First Ethos Report to Dr. Charles and ECN, but sending the Second Ethos Report, which was different than the first, only to Mr. Millman; and

    g.    Claiming to have requested that Mr. Millman's doctors review Dr. Charles Second IME Opinion to see if they would contradict his findings and relying on their not responding to the requests as evidence of Mr. Millman's fraudulent claim, even though Lincoln never actually sent the requests to Mr. Millman's doctors, thus rendering them unable to actually contradict the findings in the Second IME Opinion.

230.    Mr. Millman relied upon his disability benefits to support himself and his family, which Lincoln knew, and Lincoln abused that reliance by orchestrating the denial of Mr. Millman's disability benefits.

231.    Lincoln's intentional discontinuance of Mr. Millman's disability benefits severely damaged Mr. Millman, causing an acute increase in Mr. Millman's physical and emotional pain, exacerbation of post-traumatic stress he suffered from to the point that Mr. Millman was (and still is) afraid to leave his house and needed increased medication and doctor's care to try to combat the damage caused by Lincoln's deplorable misconduct.

232.    Plaintiff has been damaged as set forth in more fully in Paragraph 125 herein.

233.    Plaintiffs should be awarded damages, plus pre- and post-judgment interest thereon, that are the direct result of Lincoln's aforementioned misconduct, in an amount to be determined at trial but in excess of eight million dollars ($8,000,000.00).

## AS AND FOR A FIFTEENTH CLAIM
(Negligent Infliction of Emotional Distress against Lincoln)

234.    Plaintiffs repeat, reallege and incorporate the factual allegations contained in the preceding paragraphs as if more fully set forth herein.

235.    Lincoln owed Mr. Millman a duty to purposely not lie and/or deceive when it administered his disability claim.

236.    Lincoln breached this duty when it improperly pressured and conspired with ECN and Dr. Charles to have Dr. Charles issue his Second IME Opinion opining that Mr. Millman was not disabled after opining just weeks earlier that Mr. Millman was disabled, without any factual basis for doing so, so as to make Mr. Millman's disability claim appear fraudulent.

237.    Lincoln also breached this duty when it improperly conspired with Ethos to surveil Mr. Millman so it could have a surveillance report and video evidence of Mr. Millman purportedly being active so it could deny his disability claim.

238.    Lincoln's misconduct caused and continues to cause Mr. Millman to fear for his physical safety and has caused him severe emotional distress.

239.    Lincoln's misconduct caused Mr. Millman's emotional injuries.

240.    Plaintiffs have been damaged as set forth more fully in Paragraph 125 herein.

241.    Plaintiffs should be awarded damages, plus pre- and post-judgment interest thereon, that are the direct result of Lincoln's negligent infliction of emotional distress in an amount to be determined at trial but in excess of eight million dollars ($8,000,000.00).

242.    Mr. Millman is also entitled to punitive damages against Lincoln given the wanton and willful misconduct exhibited by Lincoln that harmed Mr. Millman in an amount to be determined at trial.

## AS AND FOR A SIXTEENTH CLAIM
(Defamation Against ECN)

243.    Plaintiffs repeat, reallege and incorporate the factual allegations contained in the preceding paragraphs as if more fully set forth herein.

244.    ECN'S republication of Dr. Charles' June 28, 2023, letter in which Dr. Charles changed his medical opinion of Mr. Millman from disabled to not disabled was a defamatory statement that ECN knew was untrue as ECN pressured Dr. Charles to purposefully change his opinion of Mr. Millman's disability to find him not disabled even though ECN knew that Mr. Millman was disabled.

245.    ECN republished the letter when it sent it to Lincoln in June or July 2023.

246.    The statements in the January 28, 2023, letter were false and are defamatory *per se*. In the event the defamatory statements in Dr. Charles' June 28, 2023, letter are not considered defamatory *per se*, Mr. Millman alleges special damages as set forth more fully in paragraph 125(a) herein.

247.    Mr. Millman should be awarded damages, plus pre- and post-judgment interest thereon, that are the direct result of ECN's defamatory conduct in an amount to be determined at trial but in excess of eight million dollars ($8,000,000.00).

248.    Mr. Millman is also entitled to punitive damages against ECN given the wanton and willful misconduct exhibited by ECN that intentionally harmed Mr. Millman in an amount to be determined at trial.

## AS AND FOR A SEVENTEENTH CLAIM
(Negligent Infliction of Emotional Distress against ECN)

249.    Plaintiffs repeat, reallege and incorporate the factual allegations contained in the preceding paragraphs as if more fully set forth herein.

250.     ECN owed Mr. Millman a duty to purposely not lie and/or deceive when it obtained and administered an independent medical exam of Mr. Millman.

251.     ECN breached this duty when it improperly pressured Dr. Charles into issuing his June 28, 2023, letter opining that Mr. Millman was not disabled after opining just weeks earlier that Mr. Millman was disabled, without any factual basis for doing so, so as to make Mr. Millman's disability claim appear fraudulent.

252.     ECN breached this duty when it told Dr. Charles to only review one half of Mr. Millman's medical records, when its formal instructions to Dr. Charles required him to review **all** of Mr. Millman's medical records.

253.     ECN's misconduct caused and continues to cause Mr. Millman to fear for his physical safety and has caused him severe emotional distress.

254.     ECN's misconduct caused Mr. Millman's emotional injuries.

255.     Plaintiffs have been damaged as set forth more fully in Paragraph 125 herein.

256.     Plaintiffs should be awarded damages, plus pre- and post-judgment interest thereon, that are the direct result of ECN's negligent infliction of emotional distress in an amount to be determined at trial but in excess of eight million dollars ($8,000,000.00).

257.     Mr. Millman is also entitled to punitive damages against ECN given the wanton and willful misconduct exhibited by ECN that harmed Mr. Millman in an amount to be determined at trial.

### AS AND FOR AN EIGHTEENTH CLAIM
(Aiding and Abetting Against ECN)

258.     Plaintiffs repeat, reallege and incorporate the factual allegations contained in the preceding paragraphs as if more fully set forth herein.

259.     ECN committed tortious acts against Plaintiffs.

260.    ECN insisted that Dr. Charles amend the results of his alleged "independent" medical exam to find that Mr. Millman was not disabled, after Dr. Charles initially found that Mr. Millman was disabled.

261.    ECN substantially assisted Lincoln's tortious conduct by pressuring Dr. Charles to change the findings of his "independent" medical exam to find that Mr. Millman was not disabled even though Dr. Charles had found him disabled just weeks earlier. He advised ECN and Lincoln that video footage would not change his opinion, even though video footage was the only new record Dr. Charles could have reviewed between the time he issued his initial determination and the time he changed it to find Mr. Millman was not disabled.

262.    ECN substantially assisted Lincoln's tortious conduct when it told Dr. Charles to only review one-half of Mr. Millman's medical records, when its formal instructions to Dr. Charles required him to review all of Mr. Millman's medical records.

263.    As a result of ECN's provision of substantial assistance to Lincoln's tortious conduct, Mr. Millman was damaged as set forth more fully in paragraph 125 herein.

264.    Plaintiffs should be awarded damages, plus pre- and post-judgment interest thereon, that are the direct result of ECN's aiding and abetting in an amount to be determined at trial but in excess of eight million dollars ($8,000,000.00).

265.    Mr. Millman is also entitled to punitive damages against ECN given the wanton and willful misconduct exhibited by ECN when it aided and abetted the misconduct that harmed Mr. Millman in an amount to be determined at trial.

## AS AND FOR A NINETEENTH CLAIM
(Aiding and Abetting Against Ethos)

266.    Plaintiffs repeat, reallege and incorporate the factual allegations contained in the preceding paragraphs as if more fully set forth herein.

267.    Lincoln committed tortious acts against Plaintiffs.

268.    Ethos substantially assisted Lincoln's tortious conduct by intentionally doctoring its videotape and editing its report provided to Lincoln to purport to show that Mr. Millman was not disabled.

269.    As a result of Ethos' provision of substantial assistance to Lincoln's tortious conduct, Mr. Millman was damaged as set forth more fully in paragraph 125 herein.

270.    Plaintiffs should be awarded damages, plus pre- and post-judgment interest thereon, that are the direct result of Ethos' aiding and abetting in an amount to be determined at trial but in excess of eight million dollars ($8,000,000.00).

271.    Mr. Millman is also entitled to punitive damages against Ethos' given the wanton and willful misconduct exhibited by Ethos when it aided and abetted the misconduct that harmed Mr. Millman in an amount to be determined at trial.

## **JURY TRIAL**

272.    Plaintiffs demand a trial by jury of all claims so triable.

WHEREFORE, Plaintiffs demand the Court enter judgment against the Defendants as follows:

a) Monetary damages on Plaintiffs' first through fourth and sixth through nineteenth claims in an amount to be determined at trial but in excess of $8,000,000.00, plus pre- and post-judgment interest thereon;

b) Monetary damages on Plaintiffs' fifth claim in an amount at least equal to the bond posted by Ethos as required by New York's General Business Law for private investigators;

c) Plaintiffs' costs and expenses, including reasonable attorneys' fees for having to bring this action;

d) Punitive damages against Defendants for their wanton and willful misconduct in an amount to be determined at trial; and

e) Any additional relief this Court deems just and proper.

Dated: New York, New York
September 12, 2025

**SHEPPE LLP**

/s/Matthew Sheppe
By:  Matthew Sheppe

425 Madison Avenue, 19th Floor
New York, New York 10017
Tel: (212) 753-2424
Email: msheppe@reisssheppe.com

*Attorneys for Plaintiffs*